

**ORDERED in the Southern District of Florida on July 3, 2012.**

A. Jay Cristol, Judge
United States Bankruptcy Court

---

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

In Re:

SOL, LLC

      Debtor.

_____/

ALAN GOLDBERG, as Trustee of the
Chapter 7 Estate of the debtor, SOL, LLC

      Plaintiff,

vs.

SOTHEBY'S INTERNATIONAL REALTY, LLC
f/k/a SOTHEBY'S INTERNATIONAL REALTY,
INC., a Delaware limited liability company and
MDLV, LLC, a Florida limited liability company,

      Defendants.

_____/

CASE NO.: 09-12684-BKC-AJC

Chapter 7

ADV. CASE NO.: 11-01719-AJC

## MEMORANDUM DECISION GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF THE TRUSTEE AND DENYING DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court for hearing on March 1, 2012 at 3:00 p.m. on Plaintiff's Motion for Summary Judgment [D.E. 32] and Defendants' Cross Motion for Summary Judgment [D.E. 41] (together the "Original Motions").  Since the filing of the Motion for Summary Judgment by the Trustee, the parties have filed several responsive and supplemental memoranda (the "Supplemental Memoranda"), and declarations and affidavits in support of and in opposition to the Original Motions.

The Court has considered the Motions, the Supplemental Memoranda, the other matters of record and the arguments of counsel.  Being otherwise duly advised in the premises, and based on the following findings and analysis, the Court GRANTS partial summary judgment in favor of the Trustee for constructive fraud, DENIES summary judgment in favor of the Trustee on for actual fraud, and DENIES Defendants' Cross Motion for Summary Judgment.

## A.  PROCEDURAL BACKGROUND

The Debtor, SOL, LLC ("Debtor"), filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code on February 18, 2009.  Prior to filing for bankruptcy protection, the Debtor was one of the preeminent real estate brokerage firms in South Florida, specializing in high end luxury residential properties.   The Debtor became a Sotheby's International Realty, LLC ("Sotheby's") franchisee in Miami-Dade County in 2004, and became a Sotheby's Realty franchisee in Broward County in 2005.  As a Sotheby's franchisee, the Debtor incurred certain debt under promissory notes and for royalties and advertising fees under its franchise agreements.  The obligations were guaranteed by the Debtor's principals.

During 2008, the Debtor stopped making its royalty and advertising fee payments.  In late 2008, the Debtor, its principals and Sotheby's entered into an agreement to terminate the Debtor's franchises; to have the Debtor turnover all of the Debtor's listings, listing agreements

and pending contracts to Sotheby's; and to have Sotheby's reassign those listings and pending contracts to MDLV as the Debtor's successor franchisee. The termination of the franchises and transfer of the Debtor's listings and pending contracts were effectuated through a Termination, Surrender and Cooperation Agreement (the "Turnover Agreement") between the Debtor and Sotheby's that was executed on December 11, 2008, approximately two (2) months before the Debtor's bankruptcy filing. The Turnover Agreement purported to acknowledge the amount of debt owed to Sotheby's by the Debtor, but Trustee asserts that the indebtedness reflected in the agreement was grossly inflated by inclusion of liquidated damages for "lost future profits," which are neither enforceable nor recoverable under applicable law. Defendant MDLV, LLC ("MDLV") took over all of the Debtor's listings and continues to pay the Debtor's royalties and other fees. MDLV apparently paid no separate consideration to either the Debtor or Sotheby's for the listings and pending contracts.

Trustee filed this adversary action against Sotheby's International Realty Affiliates, LLC and MDLV, LLC ("Defendants") seeking to avoid the transfer of the Debtor's listings, listing agreements and pending contracts as: (1) preferences under 11 U.S.C. § 547 (Count I); (2) fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) and (B) (Count II); (3) fraudulent transfers under 11 U.S.C. § 544 and Fla. Stat. §726.105 (Count III); (4) fraudulent transfers under 11 U.S.C. § 544 and Fla. Stat. §726.106 (Count IV); and (5) for aiding and abetting the Debtor in breaching its fiduciary duties (Count V).

Trustee moved for Summary Judgment asserting that all of the elements of constructive fraud are established – the transfer of the Debtor's listings and receivables occurred within two (2) years of the bankruptcy when the Debtor was insolvent. As to the issue of reasonably equivalent value, Trustee presented evidence that the total gross commissions earned from the

transferred listings was $911,161.00, and argued that if the Court finds that the component of damages described in the Turnover Agreement as "lost future profits" was an unenforceable penalty, or was otherwise not a recoverable element of Sotheby's damages, the debt owed by the Debtor to Sotheby's would only amount $427,970.10.  The Trustee asserts that the value of the listing agreements transferred were significantly greater than the debts owed by the Debtor to Sotheby's; Sotheby's as initial transferee and MDLV as immediate transferee, received fraudulent transfers to the extent of the overpayments, $483,190.90, for which no consideration was received by the Debtor.

The Defendants filed a Cross Motion for Summary Judgment, asserting that Sotheby's was a secured creditor, and that the transfer of the Debtor's listings and pending contracts was merely an exercise of their right to retake the assets under Article 9 of Florida's Uniform Commercial Code.  The Defendants contend that the debts owed by the Debtor to Sotheby's were all legitimate and exceeded the value of the assets assigned by the Debtor on the date of the transfer.  Sotheby's further contended the listing agreements had no value outside of the Sotheby's franchise system.  In addition, the Defendants questioned the weight and credibility of Trustee's insolvency report that was prepared for the adversary case against Kurt Bosshardt, Adv. Case. No. 09-02351-BKC-AJC-A (the "Bosshardt Report") and filed to support insolvency in the case at bar.  The Bosshardt Report considered the Debtor's insolvency as of March 2008. Defendants assert that, because the Bosshardt Report made no reference to the listing agreements at issue, the report demonstrates that Trustee's insolvency expert did not believe these listing agreements had value.

In response to the Defendants' Cross Motion for Summary Judgment, the Trustee filed a Reply Memorandum [D.E. 59] that was accompanied by the Declaration of Michael Chesal, Esq.

[D.E. 59-1], the Trustee's expert on intellectual property matters, which rebutted the Defendants' claim that the listing agreements did not have value outside Sotheby's franchise system. The Trustee also filed Soneet Kapila's Supplemental Expert Report on Insolvency [D.E. 80], which specifically addressed the value of the open listing agreements and pending contracts that were transferred and valued them at $5,378,139. The Trustee's Reply Memorandum also asserts that Trustee learned for the first time through the Affidavit of Michael Good [D.E. 43], Sotheby's President, that Sotheby's was not a licensed real estate broker, and therefore, could not legally accept a transfer of the listing agreements and pending contracts under Fla. Stat. §§ 475.41 and 475.42. The Trustee also moved to amend the Adversary Complaint to alleged claims for turnover and declaratory relief based on this theory.

The Court held the initial hearing on the Motion and Cross Motion for Summary Judgment on September 13, 2011. The Court decided at the hearing that it would consider the issues presented by the parties in stages, and would first consider whether Fla. Stat. §§ 475.41 and 475.42 barred the transfers of the listing agreements. By Order dated December 6, 2011, this Court denied the Trustee's motion to amend the Adversary Complaint, finding that Fla. Stat. §475.41 was inapplicable to this transaction.[1]

The Defendants moved to strike Mr. Kapila's Supplemental Expert Report based on judicial estoppel [D.E. 82], asserting the failure to address the value of the listings in Bosshardt Report precluded Mr. Kapila from now opining as to the value of these listings. The Trustee filed a Response to the Motion to Strike [D.E. 85], supported by Mr. Kapila's declaration, in which Mr. Kapila explained why he did not mention the value of the open listings in his prior opinion, and attested that his supplemental expert report was not inconsistent with the Bosshardt

---

[1] The Trustee filed a Motion for Leave to Appeal this Court's ruling with the District Court, which was denied [D.E. 111].

Report.  The Court denied the Motion to Strike [D.E. 92], finding that the issues raised by the Defendants went to the credibility and weight of the opinion and not its admissibility.

The Court held a pretrial conference on January 23, 2012, at which the Court set a hearing on the parties' Motion and Cross Motion for Summary Judgment.  Prior to the Summary Judgment hearing, Trustee took the deposition of Carlos Justo, the managing member of the Debtor, who effectuated the transfers that are the subject of this action.  The Trustee filed Mr. Justo's deposition with the Court [D.E. 120] to support the assertion that the Debtor transferred the listings, listing agreements and pending contracts with actual intent to delay, hinder or defraud creditors.

The parties each filed Supplemental Memoranda prior the Summary Judgment hearing. The Defendants' Supplemental Memorandum [D.E. 117] argued that Mr. Kapila's opinion of value of the listings and pending contracts should be disregarded because it is based on an insolvency analysis instead of a fair market value analysis.  The Trustee filed a Supplemental Memorandum [D.E. 119] in response which argued that Mr. Kapila used the appropriate valuation methodology, and directed the Court to Mr. Justo's testimony as demonstrating the Debtor's actual intent to delay hinder or defraud creditors.

### B.  UNDISPUTED FACTS

1.    On or about December 20, 2004, Sotheby's International Realty Affiliates, LLC ("Sotheby's") and SOL, LLC ("Debtor") entered into written franchise agreement (the "December 2004 Franchise Agreement"), as amended in writing from time to time.

2.    Pursuant to the December 2004 Franchise Agreement, Debtor obtained the non-exclusive right to use the Sotheby's Marks and System in the operation of designated real estate brokerage office located in Miami Dade County, Florida ("Office 1") upon the terms set forth in

the subject Franchise Agreements. Pursuant to the December 2004 Franchise Agreement, Debtor was authorized to use the Sotheby's Marks and SOTHEBY'S System exclusively for the purpose of promoting and operating designated licensed real estate brokerage offices and for such other additional lawful business activities provided such other activities were previously authorized in writing by Sotheby's for the designated territory for Office 1.

3.      Pursuant to the December 2004 Franchise Agreement, the Debtor agreed to pay Sotheby's an initial franchise fee, royalties, "NAF" contribution, special and local advertising assessments, transfer fees and expenses, administrative fees, financial fees, audit fees, late charges and interest, training fees and expenses, special assessments, annual conference fee, indemnification and/or elective program fees generated from Office 1.

4.      On or about October 4, 2005, Sotheby's and the Debtor separately entered into a second written franchise agreement (the "October 2005 Franchise Agreement"), as amended in writing from time to time.

5.      Pursuant to the October 2005 Franchise Agreement, the Debtor obtained the non-exclusive right to use the Sotheby's Marks and System in the operation of designated real estate brokerage office located in Broward County, Florida ("Office 2") upon the terms set forth in the October 2005 Franchise Agreement. Pursuant to the October 2005 Franchise Agreement, Debtor was authorized to use the Sotheby's Marks and SOTHEBY'S System exclusively for the purpose of promoting and operating designated licensed real estate brokerage offices and for such other additional lawful business activities provided such other activities were previously authorized in writing by Sotheby's for the designated territory for Office 2.

6.      Pursuant to the October 2005 Franchise Agreement, Debtor agreed to pay Sotheby's an initial franchise fee, royalties, "NAF" contribution, special and local advertising

assessments, transfer fees and expenses, administrative fees, financial fees, audit fees, late charges and interest, training fees and expenses, special assessments, annual conference fee, indemnification and/or elective program fees generated from Office 2.

7.     Carlos Justo and other principals of the Debtor each executed and conveyed guarantees in favor of Sotheby's, guaranteeing all of the obligations of Debtor to Sotheby's.  The guaranties are collectively referred to herein as the "Guaranties".

8.     The aforementioned fees to be paid under the December 2004 Franchise Agreement and the October 2005 Franchise Agreement (together the "Franchise Agreements") are hereinafter collectively referred to as "Royalty Fees."

9.     Sotheby's, as lender, and the Debtor and all or certain of the Guarantors, as "maker" and "co-makers", are parties to certain Development Advance Promissory Notes (collectively, the "Notes").  The first note in the amount of $328,000 (the "First Note") was executed by the Debtor and delivered to Sotheby's on March 14, 2005 in connection with Office 1.

10.     The second note in the amount of $104,000 (the "Second Note") was executed by the Debtor and delivered to Sotheby's on May 23, 2006 in connection with Office 2.

11.     The Defendants assert that concurrently with delivery of the First Note and the Second Note, the Debtor executed security agreements granting Sotheby's a security interest in all of the furniture, furnishings, equipment, real estate listings and listing agreements and related rights which were located at or related to the Approved Locations, including the proceeds and products therefrom and any and all substitutions, replacements, additions and accessions thereto, and to Luxury Premium Awards to which Debtor may be entitled pursuant to any franchise

agreement entered into with Sotheby's, together with all such rights and property hereafter acquired by Debtor (collectively, the "Collateral").[2]

12.    The Security Agreements and the financing statements applied only to the Debtor's listings and listing agreements and any rights, proceeds and products therefrom. Pending contracts, receivables and commissions from sales that were not generated from the Debtor's listings, i.e. commissions from sales in which the Debtor represented the buyer in the transaction, are not covered by the Security Agreement.

13.    During 2008 the Debtor stopped making its royalty and NAF payments and Sotheby's declared the Debtor in default under the Franchise Agreements.

14.    The Debtor and Sotheby's negotiated a termination of the franchises and repayment of accrued and unpaid royalty and NAF payments, balances owed on the advanced notes, and for alleged liquidated damages for lost future profits.

15.    On December 11, 2008, the Debtor, its principals and Sotheby's memorialized their agreement to terminate the Franchises by entering into a Termination, Surrender and Cooperation Agreement (the "Turnover Agreement") which purported to liquidate the total debts owed by the Debtor, mutually agree on termination of the Franchises for Office 1 and Office 2 and to transfer all of the Debtor's listings and listing agreements to Sotheby's.

Section 5 of the Turnover Agreement provides in pertinent part:

> 5.1 Franchisee hereby agrees to transfer to the Franchisor immediately all rights, title, ownership and interest in that Collateral as requested by Franchisor (including, but not limited to, all Accounts, General Intangibles, Instruments and all cash and non-cash proceeds thereof)

---

[2] The Trustee alleged in Count I of the Adversary Complaint that according to the Debtor's records, Sotheby's did not have a valid enforceable security agreement to secure repayment of the First Note.  The Trustee filed the deposition of Carlos Justo, who testified that he would regularly have other parties execute agreements for him and that the signature on the Security Agreement securing the First Note may not have been his.

existing as of the date hereof for collection, conveyance or other disposition by the Franchisor.

5.3 Franchisor shall have the right to send notices of the assignment of, and Franchisor's security interest in and lien on, the Collateral to any and all customers or any third party holding or otherwise concerned with any of the Collateral.  As of the date hereof, the Franchisor or its designee shall have the sole right to collect any Accounts Receivables, take possession of the Collateral, or both.

Section 6 of the Turnover Agreement provides in pertinent part:

6. Collection of Accounts Receivables by Franchisor. The Franchisee and Guarantors hereby acknowledge and agree that:

(a) the Franchisor shall exercise all of its rights and remedies to collect and receive payment from all applicable account debtors with regard to all of the Franchisee's Accounts Receivables commencing on the date hereof;

16.    On December 11, 2008, as part of the Turnover Agreement, the Debtor and Sotheby's executed an assignment and assumption (the "Assignment") of specific listings and listing agreements which are itemized in a schedule attached as an exhibit to the Assignment. The Assignment provides in pertinent part:

WHEREAS, Assignor, desires to transfer and assign the benefits and obligations of the Agreements to Assignee.

WITNESSETH, THAT FOR AND IN CONSIDERATION of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Assignor, Assignor hereby bargains, sells, grants, assigns and transfers unto Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Network Agreements that are effective as of the date hereof.

ASSIGNEE HEREBY assumes and agrees to perform any and all liabilities and obligations of Assignor under the Agreements arising after the date hereof with the same force and effect as if Assignee had signed such Agreements originally in place of Assignor; provided that such assumption shall not apply to any Agreement which requires third party consent if such consent has not been obtained.

17.     Attached to the Turnover Agreement as Exhibit "C" and to the Assignment as Exhibit "A" is a list of the open listing agreements and pending contracts that were assigned to Sotheby's.  This list included a pending contract for 1085 Hillsboro Mile for a purchase price of $7.7 million with a gross commission of 5%, half of which the Debtor would be entitled to as the cooperating broker.  This pending contract was not related to or derived from a listing that belonged to the Debtor.  This was a commission on a pending contract in which the Debtor was representing the buyer, and was not a related to one of the Debtor's listings or listing agreements.

18.     On or about, or shortly after, the same day on which the Debtor transferred its listings and listing agreements to Sotheby's, Sotheby's assigned all of these listings and listing agreements it received from the Debtor to Defendant, MDLV, pursuant to a bill of sale.  MDLV did not pay the Debtor any separate consideration for the listings.  Further, it is undisputed that MDLV did not pay any separate consideration for the Debtor's listings it received from Sotheby's.

### C.  <u>SUMMARY JUDGMENT STANDARD</u>

Under Rule 56 of the Federal Rules of Civil Procedure, incorporated herein pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper if the pleadings, deposition, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the Court that there are no genuine issues of material fact that should be decided at trial. *Jeffery v. Sarasota White Sox*, 64 F.3d 590, 593–94 (11th Cir.1995); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991). The Supreme Court explained in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26

L.Ed.2d 142 (1970), that when assessing whether the movant has met this burden, the court should view the evidence and all factual inferences in the light most favorable to the party opposing the motion and resolve all reasonable doubts in that party's favor. *See also Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988).

###   D.  APPLICABLE LAW AND DISCUSSION

###   1.  Trustee's Motion for Summary Judgment based on Constructive Fraud.

In fraudulent conveyance actions, the trustee has the burden of proof on all issues. *In re Rodriguez,* 895 F.2d 725, 726 n. 1 (11th Cir. 1990); *In re Vurchio,* 107 B.R. 363, 364 (Bankr. M.D.Fla. 1989) (*citing In re Damason Construction Corp.,* 101 B.R. 775, 777 (Bankr. M.D.Fla. 1989)).  Section 548 provides a trustee with the ability to avoid transfers made by the debtor that constructively defraud his creditors. To prevail on a claim of constructive fraud under Section 548(a)(1)(B), the Trustee must demonstrate that debtor: (1) within two years, (2) had an interest in property, (3) transferred it, (4) received less than reasonably equivalent value for that transfer, and (5) was insolvent on the date of that transfer or became insolvent as a result of the transfer. *In re Todd*, 391 B.R. 504, 507 (Bankr. S.D.Fla. 2008).

The facts as to the transfer of the listings and pending contracts within two (2) years of the bankruptcy filing while the Debtor was insolvent are uncontroverted.  The Surrender Agreement and Assignment and Assumption Agreement pursuant to which the listings and receivables for pending contracts were transferred to Sotheby's occurred on December 11, 2008, just over two (2) months prior to the Debtor's Chapter 7 bankruptcy filing.  There is no dispute that the listings and pending contracts were the Debtor's property.  Further, the Trustee has submitted the expert report of Soneet Kapila, CPA who opined that the Debtor was insolvent when the transfer was made.  Mr. Kapila's insolvency opinion is not disputed.

There being no issues of material fact as to the first three elements and the fifth element of the constructive fraud claim, the Court turns to the fourth element of the claim – whether the Debtor received reasonably equivalent value for the transfer.

**2.**   **Reasonably Equivalent Value and Defendants' Cross Motion for Summary Judgment.**

The Bankruptcy Code does not define "reasonably equivalent value," and there is no precise formula to be used to determine a reasonably equivalent value. *In re Royal Coach Country, Inc.*, 125 B.R. 668, 673 (Bankr. M.D.Fla. 1991); *In re Damason Const. Corp.,* 101 B.R. 775 (Bankr. M.D.Fla. 1989).  In making this determination, the Court must consider all facts and circumstances surrounding the transfer. *See In re Join–In Intern., Ltd.,* 56 B.R. 555 (Bankr. S.D.N.Y. 1986); *In re Nacol,* 36 B.R. 566 (Bankr. M.D.Fla. 1983).

The Trustee has presented undisputed evidence that the transferred open listings generated pre- and post-petition gross commissions of $911,161.00.[3]  The Trustee has also submitted Mr. Kapila's insolvency report which values the subject listings and pending contracts at $5,378,139.00.  The Trustee argues that because the value of the assets transferred far exceed the amount of debt that was owed by the Debtor, the Debtor did not receive reasonably equivalent value.

Defendants argue that the Debtor was in default under the Franchise Agreements and that it merely exercised its rights with respect to its collateral and that the turnover of the assets was part of a strict foreclosure under Article 9 of the Uniform Commercial Code.  Defendants have submitted a rebuttal expert report as to value rendered by Neil J. Beaton [D.E. 118], which

---

[3] The Defendants do not dispute this – Sotheby's filed the Declaration of Mayi de la Vega, the managing member of Defendant MDLV, who confirmed that total gross commissions from the open listings MDLV received from Sotheby's totaled $911,161.00.

values the listings and pending contracts at $233,345.00, and urge that because the assets transferred had a fair market value of much less than the debts owed to it, Sotheby's gave reasonably equivalent value.[4]   Defendants further contend that the Court must accept the Defendants' valuation as dispositive of the issue of reasonably equivalent value because the Trustee's evidence of value is either barred by judicial estoppel; or is legally insufficient because it is not based on fair market value.

### a.  <u>Judicial Estoppel.</u>

The Defendants argue that Mr. Kapila's Supplemental Expert Report should be barred based on judicial estoppel, asserting that the failure to address the value of the listings in the Bosshardt Report precludes Mr. Kapila from now opining as to the value of these listings. Trustee has filed Mr. Kapila's declaration explaining that his opinion as to the Debtor's insolvency in the prior proceeding is not inconsistent with his current opinion of insolvency and that his opinion as to the Debtor's insolvency in the Bosshardt Report remains unaffected by his current valuation of the listings.  Mr. Kapila's declaration further explains that the value of the listings was omitted in the prior report, not because he placed no value on them, but because they were not supplied to him in connection with the prior adversary proceedings.  Mr. Kapila's declaration further confirms that many of the listing contracts that are the subject of his current report could not have been included in the prior report because these contracts were not in place as of the date of the transfer at issue in the prior adversary proceeding.

Judicial estoppel is an equitable doctrine invoked at a court's discretion. *New Hampshire v. Maine,* 532 U.S. 742, 750, 121 S.Ct. 1808, 1815, 149 L.Ed.2d 968 (2001) (internal citations

---

[4]  The Defendants also argue that even if the Court determines that the lost future profits component of the debt owed to Sotheby's is determined to be unenforceable, the debts under the Surrender Agreement still exceed the value of the assets that were transferred.

and quotations omitted).  Under this doctrine, a party is precluded from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding. Judicial estoppel is an equitable concept intended to prevent the perversion of the judicial process." 18 James Wm. Moore et al., Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000).  The purpose of the doctrine "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire,* 532 U.S. at 749-50, 121 S.Ct. at 1814 (internal citations and quotations omitted); *Burnes v. Pemco Aeroplex, Inc*., 291 F.3d 1282, 1285 (11th Cir. 2002).  The Eleventh Circuit Court of Appeals has explained that, "[j]udicial estoppel is applied to the calculated assertion of divergent sworn positions.  The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings." *American Nat'l Bank of Jacksonville v. Federal Dep. Ins. Corp.,* 710 F.2d 1528, 1536 (11th Cir. 1983) (internal citation omitted); *see also Coastal Plains,* 179 F.3d at 205 ("[t]he purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest.") (internal quotations omitted).  In the Eleventh Circuit, courts consider two factors in the application of judicial estoppel to a particular case. *Salomon Smith Barney, Inc. v. Harvey, M.D.,* 260 F.3d 1302, 1308 (11th Cir. 2001).  "First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Id.*

The Supreme Court observed that, "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle;" nevertheless, the Court went on to enumerate several factors that inform a court's decision

concerning whether to apply the doctrine in a particular case. *New Hampshire,* 532 U.S. at 750-51, 121 S.Ct. at 1815 (internal citations omitted).  Courts typically consider: (1) whether the present position is "clearly inconsistent" with the earlier position; (2) whether the party succeeded in persuading a tribunal to accept the earlier position, so that judicial acceptance of the inconsistent position in a later proceeding creates the perception that either court was misled; and (3) whether the party advancing the inconsistent position would derive an unfair advantage on the opposing party. *Id.*

The Court considered the judicial estoppel argument when the Defendants moved to strike the report based on judicial estoppel, and denied the motion.  The Court found that the issues raised by the Defendants as to the expert opinion went to the weight and credibility of the report and not its admissibility.  The Court remains of the view that judicial estoppel does not bar Mr. Kapila's opinion as to value.  In the case at bar, the first element of judicial estoppel, a clear inconsistency in positions is lacking here.  Mr. Kapila's opinion as to the Debtor's insolvency in this case is not inconsistent with his opinion in other cases involving this Debtor, and his omission of the value of the listings from his prior report adopted by the Court was not based on any affirmative finding that the listings had no value.  Whatever "inconsistencies" may be proven are not the kind of "inconsistencies" calculated to make a mockery of the judicial system.

### b.  Fair Market Value vs. Insolvency Valuation.

Defendants alternatively contend that Mr. Kapila's opinion as to value must be disregarded because Mr. Kapila used an insolvency test to value the transferred assets rather than fair market value.  The Court rejects this argument.  The Bankruptcy Code defines the term "insolvent" as follows:

**(32)** The term "insolvent" means—

(**A**) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, ***at a fair valuation***, exclusive of—

(**i**) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(**ii**) property that may be exempted from property of the estate under section 522 of this title;

11 U.S.C. § 101(32).

The law is well settled that the value of an asset under the balance sheet test is neither the asset's value in the best case, nor is it the asset's value in the worst case. *In re Golden Mane Acquisitions, Inc.,* 221 B.R. 963, 967-68 (Bankr. N.D. Ala. 1997); *see also Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley),* 93 B.R. 925, 927 (Bankr. W.D.Tex. 1988). Rather, most courts have assigned assets their market value at the time of the disputed transfers when assessing asset values. *See Briden v. Foley*, 776 F.2d 379, 382 (1st Cir. 1985) (balance sheet test focuses on fair market value of debtor's assets and liabilities within reasonable time of transfer). "[F]air market price is the most equitable standard." *Syracuse Engineering Co. v. Haight,* 110 F.2d 468, 471 (2d Cir. 1940) (citations omitted). Assets, therefore, are best valued by determining what price they would bring on the open market. *See Energy Cooperative, Inc. v. Cities Service Co. (In re Energy Cooperative),* 109 B.R. 822, 824 (N.D.Ill. 1989); *Sleepy Valley,* 93 B.R. at 927; cf. *Excello Press, Inc. v. Bowers, Inc. (In re Excello Press, Inc.),* 96 B.R. 840, 842 (Bankr. N.D.Ill. 1989) (fair value is what can be realized from converting assets into cash). An open market value, or simply, market value, has been further defined as that value that a prudent business person can obtain from the sale of an asset when there is a willing buyer and a willing seller. *See Grandison v. Nat'l Bank of Commerce of Rochester,* 231 F. 800, 804–05 (2d Cir. 1916); *Irving Trust Co. v. Manufacturers' Trust Co.,* 6 F.Supp. 185, 187 (S.D.N.Y.1934).

Fair value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.

*Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.),* 78 F.3d 30, 35 (2d Cir.1996).

In *WRT Energy Corp.*, the Court held that the same test used to determine fair market value is used for fair valuation of assets under the balance sheet test:

This is basically the same test as used for the "fair valuation" of assets under the balance sheet insolvency test. *See WCC Holding Corp. v. Texas Commerce Bank– Houston,* 171 B.R. 972, 985 (Bankr. N.D.Tex. 1994)(UFTA case calculating and comparing, for reasonably equivalent value determination, total consideration exchanged in sale transaction based on fair valuation of assets of debtor, which was going concern). Courts often use the same valuation figures for the insolvency test and the reasonably equivalent value calculations.

*In re WRT Energy Corp.*, 282 B.R. 343, 405-06 (Bankr. W.D.La. 2001).

The Bankruptcy Code and case law supports the conclusion that the valuation of assets at "fair value" for purposes of insolvency under the balance sheet test focuses on fair market value of the Debtor's assets and liabilities within a reasonable time of the transfer. There is nothing in the record to suggest that Mr. Kapila did not follow these fundamental tenets of valuation, which required the use of fair market value to asses all of the Debtor's assets for purposes of insolvency, including the value of the listings. In reaching his conclusion on value, Mr. Kapila determined the value of the listings from the perspective of the Debtor's continued ability to earn income had those listing not been transferred, and took into account various factors based on market data to reflect a reduction between list price and sales price and potential reductions due to expired or withdrawn listing contracts to determine the percentage of open listing contracts that would ultimately close. The information he used was based on information and data that would be known at the time of the transfer.

The Third Circuit succinctly described "reasonably equivalent value" as follows:

"The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the commercial value of the assets transferred. Thus, when the debtor is a going concern and its realizable going concern after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received."

*Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 647 (3d Cir.1991).

Consistent with the case law, Mr. Kapila's valuation focuses on whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the commercial value of the assets transferred, i.e. whether the Debtor's realizable going concern after the transaction was exceeded by its going concern value before the transaction. *Id.* For these reasons, the Court will not disregard Mr. Kapila's opinion of value and holds that the Defendant's valuation is not dispositive of whether reasonably equivalent value was given in return for the transfer.

### c. **Strict Foreclosure under Florida's Uniform Commercial Code.**

Defendants also assert that the transfer of the Debtor's assets was merely an exercise of their rights as a secured creditor to retake the assets under Florida's Uniform Commercial Code, Fla. Stat. §§ 679.620 and 679.622, and that the value of the assets were far exceeded by the debts owed by the Debtor on the date of the transfer. The Court must first determine whether all of the assets transferred by the Debtor to Sotheby's were covered by a valid enforceable security agreement, and if so, whether the security interest was properly perfected under Florida law.

The Trustee has presented undisputed evidence that at least one of the pending contracts that was transferred was not covered by the security agreements and financing statements. The Security Agreements and financing statements cover the following assets:

All of the furniture, furnishings, equipment, ***real estate listings and listing agreements and related rights*** which are located at or related to the residential real estate brokerage business conducted by Debtor and ***including the proceeds and products therefrom*** and any and all substitutions, replacements, additions and accessions thereto and to Luxury Premium Awards to which Debtor may be

entitled pursuant to any franchise agreement entered into with Secured Party, together with all such rights and property hereafter acquired by Debtor.

The Security Agreements and the financing statements appear to apply only to the Debtor's listings and listing agreements and any rights, proceeds and products therefrom. Pending contracts, receivables and commissions from sales that were not generated from the Debtor's listings, i.e. commissions from sales in which the Debtor represented the buyer in the transaction, do not appear to be covered by the Security Agreement.

Section 5 of the Turnover Agreement provides in pertinent part:

5.1 Franchisee hereby agrees to transfer to the Franchisor immediately all rights, title, ownership and interest in that Collateral as requested by Franchisor (including, but not limited to, all Accounts, General Intangibles, Instruments and all cash and non-cash proceeds thereof) existing as of the date hereof for collection, conveyance or other disposition by the Franchisor.

Attached to the Turnover Agreement is a list of the listing agreements and pending contracts that were assigned to Sotheby's. This list included a pending contract for 1085 Hillsboro Mile for a purchase price of $7.7 million with a gross commission of 5%, half of which the Debtor would be entitled to as the cooperating broker. Trustee disputes that this pending contract *was related to or derived from a listing that belonged to the Debtor*. This was a commission on a pending contract in which the Debtor was representing the buyer, and it appears from the record that it is unrelated to one of the Debtor's listings or listing agreements. Thus, because Sotheby's security interest only covered *related rights and proceeds from the Debtor's listings and listing agreements*, the commission from this pending contract does not appear to be covered by the Security Agreements or financing statements. As such, the documents of record do not support that the transfer was part of a strict foreclosure in compliance with Florida law.

Even if the turnover was a proper strict foreclosure in compliance with Florida law, a determination of whether reasonably equivalent value was given in return for the assets

transferred is still required.  Under Florida's fraudulent transfer law, reasonably equivalent value is deemed given only where the transferee acquires the interest in the asset pursuant to a *regularly conducted, noncollusive foreclosure sale* or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement:

> 2) For purposes of §§ 726.105(1)(b) and 726.106, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a *regularly conducted, noncollusive foreclosure sale* or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

Fla. Stat. § 726.104(2) (2012) (emphasis added).

Strict foreclosure is conspicuously omitted from the statute that prescribes the types of transfers in which reasonably equivalent value is presumed.  Here, it is undisputed that transfer of the listings, listing agreements and receivables to Sotheby's, and then immediately to MDLV, was not by means of a regularly conducted, non-collusive foreclosure sale within the meaning of the Act. *See Huntsman Packaging Corp. v. Kerry Packaging Corp.*, 992 F. Supp. 1439, 1447 (M.D. Fla. 1998), *aff'd sub nom. Huntsman Packaging v. Kerry*, 172 F.3d 882 (11th Cir. 1999). As such, Defendants' claim that the transfer was by means of a strict foreclosure under Florida's UCC does not bar the Trustee's claims for constructively fraudulent transfers under 11 U.S.C §548 (a)(2) or under Fla. Stat. §§ 726.105(b)(1) and 726.106.

Further, case law is clear that even when the asset is transferred by strict foreclosure under Article 9 of the UCC, the Court must still determine whether reasonably equivalent value was given. In *In re Chase,* cited by the Defendants in their Supplemental Memorandum, the Court wrote:

> Fraudulent conveyance law aims "to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have

> been transferred away." *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir.2000) (citing *In re Cybergenics Corp.*, 226 F.3d 237, 241–42 (3d Cir.2000)); see also, Becker v. Becker, 138 Vt. 372, 379, 416 A.2d 156 (1980) (purpose of state statute is to prevent the conveyance from depriving creditors of the means of collecting their debts). Fraudulent conveyance statutes, whether under federal or state law, seek to avoid a windfall to the creditor, to prevent a disproportionate loss to the debtor and, especially in bankruptcy cases, to recognize the rights of unsecured creditors to all of the debtor's non-exempt assets, including non-exempt equity in real estate.

> When a party moves to avoid a transfer that occurred through strict foreclosure, the Court must determine the value of the property transferred and compare it to the outstanding debt obligation as the first step in ascertaining whether the debtor received reasonably equivalent value.

328 B.R. 675 (Bankr. Vt. 2005).

Strict foreclosure in accordance with state law is not a *per se* transfer for reasonably equivalent value. *Id.* This Court is guided by the case law that clearly holds that even where there is a transfer that occurs through strict foreclosure, the Court must still determine whether the debtor received reasonably equivalent value. In the case at bar, there are disputed issues of fact as to the value of the listings and pending contacts transferred relative to the legitimate debts that were owed by the Debtor when the transfer was made, which preclude a finding that the Trustee's constructive fraud claims are barred by strict foreclosure.

Accordingly, there are disputed issues of fact as to the value of the listings and pending contracts transferred relative to the legitimate debts that were owed by the Debtor when the transfer was made. This precludes a dispositive finding of whether reasonably equivalent value was given in return for the transfer as a matter of law. Accordingly, Defendants' Cross Motion for Summary Judgment is DENIED. However, the Court GRANTS PARTIAL SUMMARY JUDGMENT in favor of the Trustee against Sotheby's and MDLV on the constructive fraud count insofar as the undisputed facts establish the transfer of the Debtor's property within two

(2) years of the bankruptcy while the Debtor was insolvent. The Trustee's fraudulent transfer claims based on constructive fraud shall proceed to trial solely on the issue of whether the Debtor received reasonably equivalent value.

### 3. Trustee's claims for fraudulent transfer based on Actual Intent to Hinder, Delay and Defraud Creditors.

Defendants Cross Motion for Summary Judgment seeks dismissal of the Trustee's claim based on actual intent to delay hinder and defraud creditors under 11 U.S.C. § 548(a)(1) and Fla. Stat. § 726.105(a)(1). The thrust of the Cross Motion for Summary Judgment as to this claim is that Defendants merely exercised their rights as a secured creditor to retake their collateral and that reasonably equivalent value was given by Sotheby's in return for the transfers. Defendants further contend that the Debtor had no equity in the assets transferred and therefore could not hinder, delay or defraud creditors.

Pursuant to 11 U.S.C. § 548(a)(1):

> **(a)(1)** The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > **(A)** made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

Because a debtor is not likely to testify that he had the requisite intent to defraud creditors, the intent to hinder, delay, or defraud can be inferred from extrinsic evidence and the presence of badges of fraud. *See In re Lordy,* 214 B.R. 650, 664 (Bankr. S.D.Fla. 1997); *In re Warner,* 87 B.R. 199, 202 (Bankr. M.D.Fla. 1988). Badges of fraud include: (1) a relationship between the debtor and the transferee; (2) lack of consideration for the conveyance; (3)

insolvency or indebtedness of the debtor; (4) the transfer of the debtor's entire estate; (5) reservation of benefits, control or dominion by the debtor; (6) secrecy or concealment of the transaction; and (7) pendency or threat of litigation at the time of the transfer. *See Warner,* 87 B.R. at 202.  While a single badge of fraud may simply raise suspicion, the presence of several badges of fraud, when considered together, may form the basis for a finding of actual fraud. *Id.* at 203; *see also In re Clarkston*, 387 B.R. 882, 887 (Bankr. S.D.Fla. 2008).

There is ample evidence of the badges of fraud in the record to support the Trustee's claim of actual fraud that precludes the entry of summary judgment in favor of the Defendants. It is undisputed that the Debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.  The transfer was made shortly after the Debtor incurred a $1.1 million judgment in favor of Irving Padron.  The Debtor did not disclose the transfer to its creditors and ceased operations after the transfer occurred. Further, the Trustee supplemented his Motion for Summary Judgment, asserting that the Debtor's undisputed testimony establishes that the Debtor's motivation for transferring all of its listings and pending contracts was to avoid paying the debts owed to the estate's largest creditor, Irving Padron, and Mr. Padron's girlfriend, Techrin Hijazi,[5] whose claims the Debtor believed to be frivolous.  Mr. Justo testified:

> Q:     Okay.  At the time that you turned everything over to Sotheby's, and the listings and the association was taken over by Mayi de la Vega, did you tell the people who were claiming that SOL owed them money that you were transferring the whole - - the operation to - - you know, back to - - the franchise back to Sotheby's?
>
> MR. CERRA: Object to the form.
>
> A:     I don't know.  I don't - - I do remember that I think I had a major obligation with Sotheby's, if I am not mistaken.  That once all of it - - that I lost

---

[5] Mr. Padron filed a claim in the amount of $1.1 million based on a judgment he obtained against the Debtor in State Court on August 4, 2008 [Claim No. 13].  Ms. Techrin Hijazi has filed a claim for commissions owed in the amount of $175,000.00 [Claim No. 12].

and surrender, I was also released from that.  I don't know about which creditors, because I don't - - did we have a lot of vendors?

BY MR. KUKOFF:

Q:      Well, according to the claims register, whatever they are, they are.

But, at the time, do you recall that there was a large judgment that was entered against Sol in August of 2008 by Irving Padron?

A:      *Well, Irving Padron's judgment is one of the straws that broke the camel's back, you know, for me to - - because I made a decision at that time that that - - pardon my English - - SOB would not be getting any money from me.  And because - - for whatever reason.*

*And then there was his girlfriend, Techrin, that finally she got a judgment, because I basically at that time allowed her to - - I told my attorney to drop it.  Don't even represent to her, because I was really fed up with what was happening with him and her.  And, to me, those were - -*

Q:      *Those were the two big - -*

A:      *Those were the - - she was a massage therapist.  Can you imagine, a massage therapist came to work with me as a team member?  And I can't - - oh, I don't even want to think about it.*

Where there is direct evidence of the Debtor's actual intent to defraud creditors, whether the Debtor received reasonably equivalent value is not an essential element of a cause of action for fraudulent transfer under 11 U.S.C. § 548(a)(1).  As Judge Hyman held in *In re Model Imperial*, in contrast to 11 U.S.C. § 548(a)(2), which does require absence of reasonably equivalent value as an essential element of an avoidable transfer, the plain language of 11 U.S.C. § 548(a)(1) contains no such requirement; it merely requires that the transfer be made with the requisite intent to hinder, delay or defraud creditors. 250 B.R. 776, 793-94 (Bankr. S.D.Fla. 2000).

The complementary Bankruptcy Code sections make it clear that this is the proper statutory construction. First, if diminution of the estate were an essential element of a § 548(a)(1) claim, then § 548(a)(2) would be redundant. Second, if an exchange for reasonably equivalent value negated fraudulent intent *per se,* § 548(c) and § 550(b), which create affirmative defenses for receiving a transfer "for value," would be unnecessary. Third, the absence of reasonably equivalent value is only one of the badges of fraud that courts consider in determining

>whether a transfer were made with fraudulent intent under § 548(a)(1). *See, e.g.,*
>*In re Spatz,* 222 B.R. 157, 169 (N.D.Ill.1998) (finding that under UFTA,
>reasonably equivalent value relates to only one of several badges of fraud and is
>not an absolute defense).

*Id.*

Here, there is evidence of the Debtor's principal's motive in transferring the listings and pending contracts.  However, such limited exchange is not dispositive of the Debtor's intent to hinder, delay and defraud creditors.  As the Defendants point out, objections to the questions were raised at the deposition and left unresolved.  The questions and answers on which the Trustee places great reliance are subject to interpretation.  The Defendants assert Mr. Justo's answers relate to why the Debtor filed for bankruptcy, rather than why the Debtor transferred the assets to Sotheby's.  Also, Defendants argue that because of counsel's frequent use of the word "you" during the deposition, it could be inferred that Mr. Justo's answer offered reasons why he personally filed for bankruptcy, and not why SOL filed for bankruptcy or transferred the assets.  Finally, Defendants contend that because the Debtor had no equitable interest in the assets transferred, there could be no intent to hinder, delay or defraud creditors as no funds would have been available for distribution to unsecured creditors from the liquidation of the collateral.  The foregoing indicates there are ample questions of material fact that exist and preclude summary judgment on the issue of actual intent to hinder, delay and defraud creditors.  The Court therefore DENIES the motions for summary judgment with respect to the claims for avoidance based on actual fraud.

### 4.  **The Defendants' Cross Motion for Summary Judgment as to the Trustee's Remaining Claims is Denied.**

Defendants have moved for summary judgment as to the Trustee's claims to avoid preferential transfers under 11 U.S.C. § 547 (Count I) and for damages based on aiding and

abetting the Debtor's breach of fiduciary duties (Count V).  For the following reasons, the Court concludes there are issues of material fact that preclude summary judgment as to these claims.

    **a.  <u>Trustee's Preference Claim</u>**.

The Trustee alleged a preference claim in Count I of the Adversary Complaint, alleging that Sotheby's did not have a valid enforceable security agreement to secure repayment of the First Note, and that the transfers made within ninety (90) days of the bankruptcy filing to repay the debts owed on the First Note was a preference.  The Trustee filed the deposition of Carlos Justo, who testified that he would regularly have other parties execute agreements for him and that the signature on the Security Agreement securing the First Note may not have been his.  This creates an issue of fact as to the validity of the Security Agreement purporting to secure the First Note.

Further, the Trustee has presented evidence that at least one of the pending contracts that was transferred as part of the Termination Agreement and Assignment was not covered by any of the Security Agreements.  The Trustee asserts the Security Agreements and financing statements only covered the Debtor's listing and listing agreements and any proceeds or products therefrom, and did not extend to commissions generated or receivables from pending contracts in which the Debtor represented the buyer.  Thus, issues of material fact exist as to the preference claim, and accordingly, the Defendants' Cross Motion for Summary Judgment as to Count I of the Adversary Complaint is DENIED.

    **b.  <u>Aiding and Abetting Breach of Fiduciary Duty.</u>**

The four (4) elements for a claim of aiding and abetting a breach of fiduciary duty are: "(1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's

substantial assistance or encouragement of the wrongdoing." *See AmeriFirst Bank v. Bomar*, 757 F.Supp. 1365, 1380 (S.D. Fla. 1991) (citations omitted); *In re Caribbean K Line, Ltd*., 288 B.R. 908, 919 (S.D. Fla. 2002).  The fiduciary duties of officers and directors are extended to the creditors of a corporation when the corporation becomes insolvent or is in the "vicinity of insolvency." *In re Trafford Distrib. Ctr., Inc*., 431 B.R. 263, 290 (Bankr. S.D.Fla. 2010).

Carlos Justo, and the other principals of the Debtor, owed a fiduciary duty to the Debtor's creditors once the Debtor became insolvent or was in the vicinity of insolvency.  There is record evidence in the form of sworn interrogatory responses from both Defendants and the declaration of Michael Good, Sotheby's CEO, that support the Trustee's claim that the Defendants were culpable in overtly encouraging the Debtor to turn over all of its listings and commissions to serve the self-interests of Sotheby's and Mr. Justo without any regard to the interests of the Debtor's creditors.

Issues of material fact exist as to the Trustee's aiding and abetting claim, and accordingly, the Defendants' cross motion for summary judgment as to Count I of the adversary complaint is DENIED.

For the reasons set forth herein, it is

**ORDERED AND ADJUDGED** that:

1.    Trustee is GRANTED PARTIAL SUMMARY JUDGMENT as to his fraudulent transfer claim based on constructive fraud under 11 U.S.C. § 548 (a)(1)(B) and Fla. Stat. §726.106 insofar as he has established that the Debtor's listings, listing agreements and pending contracts were transferred within two (2) years of the Debtor's bankruptcy filing while the Debtor was insolvent.  Trustee's constructive fraud claim shall proceed to trial in the District

Court solely on the issue of whether the Debtor received reasonably equivalent value in return for the transfer, and if not, the amount of Trustee's damages.

2.      Trustee is DENIED PARTIAL SUMMARY JUDGMENT as to his fraudulent transfer claim based on actual fraud under 11 U.S.C. § 548(a)(1)(A).

3.      The Defendants' Cross Motion for Summary Judgment is DENIED.

###

Confirmed copies to:

Ian J. Kukoff, Esq.
Joseph Cerra, Esq.